IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Norton, *et al.*, | Civil Action No. 02-0035 (JR) |
| Standing Rock Sioux Tribe v. Norton, *et al.*, | Civil Action No. 02-0040 (JR) |
| Three Affiliated Tribes of the Fort Berthold Reservation v. Norton, *et al.*, | Civil Action No. 02-0253 (JR) |
| Shoshone-Bannock Tribes of the Fort Hall Reservation v. Norton, *et al.*, | Civil Action No. 02-0254 (JR) |
| Chippewa Cree Tribe of the Rocky Boy's Reservation v. Norton, *et al.*, | Civil Action No. 02-0276 (JR) |
| Yankton Sioux Tribe v. Norton, *et al.*, | Civil Action No. 03-1603 (JR) |
| Osage Tribe of Indians of Oklahoma v. United States of America, *et al.*, | Civil Action No. 04-0283 (JR) |
| Crow Creek Sioux Tribe v. Kempthorne, *et al.*, | Civil Action No. 04-0900 (JR) |
| Omaha Tribe of Nebraska v. Kempthorne, *et al.*, | Civil Action No. 04-0901 (JR) |
| Oglala Sioux Tribe v. Kempthorne, *et al.*, | Civil Action No. 04-1126 (JR) |
| The Confederated Tribes of the Colville Reservation v. Norton, *et al.*, | Civil Action No. 05-2471 (JR) |
| Wyandot Nation of Kansas v. Kempthorne, *et al.*, | Civil Action No. 05-2491 (JR) |
| Rosebud Sioux Tribe v. Kempthorne, *et al.*, | Civil Action No. 05-2492 (JR) |
| Winnebago Tribe of Nebraska v. Kempthorne, *et al.*, | Civil Action No. 05-2493 (JR) |
| Lower Brule Sioux Tribe v. Kempthorne, *et al.*, | Civil Action No. 05-2495 (JR) |

1

| | | |
|---|---|---|
| Prairie Band of Potawatomi Nation<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 05-2496 (JR) |
| | ) | |
| Te-Moak Tribe of Western Shoshone<br>Indians v. Norton, *et al.*, | ) | Civil Action No. 05-2500 (JR) |
| | ) | |
| Cheyenne River Sioux Tribe<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-1897 (JR) |
| | ) | |
| Stillaguamish Tribe of Indians<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-1898 (JR) |
| | ) | |
| Iowa Tribe of Kansas and Nebraska<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-1899 (JR) |
| | ) | |
| Confederated Tribes of the Goshute<br>Reservation v. Kempthorne, *et al.*, | ) | Civil Action No. 06-1902 (JR) |
| | ) | |
| Muskogee (Creek) Nation of Oklahoma<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2161 (JR) |
| | ) | |
| Eastern Shawnee Tribe of Oklahoma<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2162 (JR) |
| | ) | |
| Northwestern Band of Shoshone<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2163 (JR) |
| | ) | |
| Red Cliff Band of Lake Superior Indians<br>Indians v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2164 (JR) |
| | ) | |
| Pechanga Band of Luiseno Mission Indians<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2206 (JR) |
| | ) | |
| Colorado River Indian Tribes<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2212 (JR) |
| | ) | |
| Tohono O'Odham Nation<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2236 (JR) |
| | ) | |
| Nez Perce Tribe, *et al.*,<br>v. Kempthorne, *et al.*, | ) | Civil Action No. 06-2239 (JR) |
| | ) | |
| | ) | |

2

| | | |
|---|---|---|
| Passamaquoddy Tribe of Maine<br>v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2240 (JR) |
| Salt River Pima-Maricopa Indian<br>Community v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2241 (JR) |
| Coeur D'Alene Tribe v. Kempthorne, *et al.*, | ) ) | Civil Action No. 06-2242 (JR) |
| Ak-Chin Indian Community<br>v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2245 (JR) |
| Sokaogon Chippewa Community<br>v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2247 (JR) |
| Gila River Indian Community<br>v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2249 (JR) |
| Northern Cheyenne Tribe of Indians<br>v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2250 (JR) |
| Haudenosaunee: The Onondaga Nation<br>v. Kempthorne, *et al.*, | ) ) ) | Civil Action No. 06-2254 (JR) |

## DECLARATION OF ROSS O. SWIMMER
## IN SUPPORT OF DEFENDANTS' MOTION FOR VOLUNTARY REMAND

Pursuant to 28 U.S.C. § 1746, I, Ross O. Swimmer, declare as follows:

1.    I am the Special Trustee for American Indians in the United States Department of the

Interior (Interior). I have held this position since 2003. As Special Trustee, my responsibilities

include, but are not limited to, oversight of reform efforts for the operation of the Indian fiduciary

trust by Interior's various offices and bureaus, and the direction and oversight of Interior's

current and historical Indian trust accounting activities. I previously served as Interior's

Assistant Secretary-Indian Affairs, from 1985 to 1989, in which capacity I was responsible for

Interior's general policies regarding Indian affairs and for the oversight of Indian activities,

principally through the Bureau of Indian Affairs (BIA). I am an enrolled member of the

Cherokee Nation of Oklahoma, and I served three successive terms as its Principal Chief, from

1975 to 1985.

2.      I make this declaration in support of Interior's request for a voluntary remand and

associated stay of the tribal trust accounting and trust mismanagement litigation claims in the

cases specified above, so that Interior can prepare and provide a plan to address the tribes'

request for accountings, as required by law. As described in greater detail below, in preparing

this proposed accounting plan (which it proposes to apply to all tribes), Interior will make a

number of factual, technical, fiscal, legal and policy determinations. Also, as described

specifically below, Interior will review and consider the trust accounting work that it and others

have undertaken in the past and that it is currently undertaking. I recognize and appreciate the

significance of this matter and am committed to having Interior dedicate the necessary and

appropriate resources, within the limits of funding provided by Congress, to prepare and provide

the accounting plan in a timely manner. Specifically, if the Court grants Interior's remand

request and stays the litigation, I am committed to having Interior produce its tribal accounting

plan within six (6) months of the date of the Court's decision granting the remand and staying the

litigation. In my judgment, after consultation with the offices most involved in the preparation

of a tribal accounting plan, this is a reasonable time period considering the pending workload, the

time necessary to gather additional information from accountants and researchers, and the

possibility of decisions from this Court in the *Cobell* litigation which may affect some of the

considerations in the plan.

3.      I summarize below some of the past and current analyses, data and document collection

efforts, and other work by Interior that is directly associated with or relevant to Interior's proposed tribal accounting plan.  I believe that this background information is helpful to the Court's consideration of Interior's remand and litigation stay requests.  The background information demonstrates tribal accounting work Interior has been doing for the past and Interior's present capability to prepare the proposed tribal accounting plan.

### Tribal Trust Funds and Reports Made to Tribes Before 1994

4.      Interior holds money and lands in trust for American Indian Tribes according to federal law.  The number of tribal trust fund accounts under Interior's management has grown over time as a result of events such as agreements and legislation.  The two most common kinds of tribal trust fund accounts are known as proceeds of labor accounts and judgment or award accounts. Proceeds of labor accounts relate to revenue generated from activities that tribes authorize to occur on tribal trust lands, *e.g.,* oil and gas development, farming and grazing, while judgment or award accounts relate to judgments or awards that tribes received from federal courts and Congress.  Tribes sometimes have had accounts within the Individual Indian Monies (IIM) system; these accounts, sometimes called voluntary deposit accounts or Tribal IIM accounts (as distinct from the "tribal trust fund accounts" I discuss elsewhere in this declaration), were created for a variety of purposes, such as revolving loan funds, tribal enterprises (such as timber mill operations), and income from tribes' undivided interests in allotted lands.  Key differences exist between management of tribal trust accounts and IIM accounts such as the tribal trust accounts are not pooled as are the IIM accounts.  Also, tribal trust account disbursements are handled differently and normally require different types of authorization (including from tribal councils).

5.      Over the years, Interior has developed and implemented specialized policies, regulations,

5

business systems and forms for handling trust funds and maintaining and reporting its records of account. Prior to 1951, each BIA Agency Office (typically located on Indian reservations) accounted for financial activity using handwritten ledgers and journals. In the early 1950s, Interior installed a more centralized accounting system in the BIA Area (Regional) Offices that integrated all fund types, such as IIM and Tribal. Beginning in 1965, BIA began further centralizing its accounting functions using a mainframe computer, with that conversion completed in the late 1960s. The Trust Funds Management System (TFMS or Finance) was developed and implemented in 1968 and modified in 1974. The earliest date for which Interior now has electronic account and transaction data available for tribes is July 1, 1972 (the Tribal Electronic Ledger Era). These electronic data came from the TFMS system starting in 1982 and were keyed from hard copy TFMS system reports for July 1, 1972-1982. For the period before July 1, 1972 (the Tribal Paper Ledger Era), account and transaction information currently is available only in hard copy reports and ledgers. The Office of Trust Funds Management (OTFM) used TFMS until it converted in April 1995 to the Omnitrust system, a commercial trust management system used by private-sector trust entities, for activity in tribal trust fund accounts. OTFM converted tribal trust fund accounts from Omnitrust to Trust 3000, another commercial trust management system, on March 1, 1999. Interior has the electronic transaction data from the Omnitrust and Trust 3000 time periods.

6.      As tribal leader from 1975-1985, I recall receiving reports from BIA that provided information on beginning and ending balances, receipts and disbursements. (Interior presently provides tribes with more detailed information in their periodic statements of performance, as I discuss below.) I am aware that account specific information about tribal trust fund accounts was

6

also reported until the early 1970s in the Department of the Treasury's (Treasury) Combined

Statement of Receipts, Expenditures and Balances of the United States Government (Combined

Statement), a published report required to be submitted annually to Congress.

### The Tribal Reconciliation Project

7.    In May 1991, BIA hired the accounting firm, Arthur Andersen LLP (Andersen), to

conduct agreed-upon procedures for the tribal trust fund accounts, commonly known as the

Tribal Reconciliation Project (TRP).  Interior also consulted extensively with tribal groups,

including what now is known as the Inter-Tribal Monitoring Association (ITMA), a national

tribal consortium consisting of numerous federally-recognized tribes, concerning the procedures

that Andersen would use.  The information provided to tribes as part of the TRP results generally

included (1) transaction by transaction account statements (receipts, interest earnings,

disbursements, balances, etc.) for tribal trust fund accounts for the July 1, 1972 (Fiscal Year

1973), to September 30, 1995 (Fiscal Year 1995) period;  (2) a report describing the procedures

performed for the FY 1973 to FY 1992 period and the results thereof, and (3) electronic images

of source documents[1] that supported certain FY 1973 to FY 1992 transactions.

8.    The results of the TRP were provided in early 1996 to tribes with tribal trust fund

accounts.  Those tribes then were asked to attest to the accuracy of their account balances, as

stated in their TRP results, as of September 30, 1995.  I have reviewed the attestation responses

provided by many of the tribes who now have 37 accounting cases pending before this Court.  I

---

    1 Source documents are the various trust fund-related financial documents, including those
related to non-investment receipt transactions (e.g., deposit ticket, schedule of collections and journal
voucher), investment transactions (e.g., accounts distribution sheet and Treasury market securities
purchase form), and non-investment disbursement transactions (e.g., request for withdrawal and voucher
and schedule of payment).

note that, for example, four of the tribes: Gila River Indian Community, the Oneida Nation, the Northern Cheyenne and the Stillaguamish each accepted the accuracy of the balances provided to them.[2] The other responses received from the 54 tribes represented in the 37 cases[3] before this Court were distributed as follows: 17 tribes disputed the results; 10 tribes requested more time for review. Twenty-one tribes never responded. Interior then reported to Congress on the TRP results, including these responses from tribes, as required by 25 U.S.C. § 4044.

9.      Following the completion of the TRP, from 1996-1998, Interior attempted to resolve the disputed tribal account balances of which it had been made aware. In part, this was by consulting with tribes (including, but not limited to those with accounting cases before this Court) and then submitting legislative proposals to Congress that recommended measures such as mediation in order to settle each individual tribe's specific claims. Interior also continued to work to reconcile even more of the non-investment transactions than had been completed within the deadline Congress had set for the completion of the TRP.

### Overview of Selected Trust Reform Measures, 1994-Present

10.     In 1994, Congress created the Office of the Special Trustee for American Indians (OST) and charged the Special Trustee with the responsibility to ensure that Interior developed and implemented appropriate reform measures to further discharge its trust duties. In particular, Congress tasked the Special Trustee with monitoring a "fair and accurate accounting" of the trust

---

2 Oneida is part of the Haudenosaunee confederation.

3 Wyandot Nation of Kansas and Mohawk Nations did not receive a TRP. The additional 11 named Plaintiffs under Nez Perce had their own responses; there are five (5) additional tribes under Haudenosaunee. Passamaquoddy had two governing entities, of which only one responded.

accounts. (25 U.S.C. § 4043(b)). By Secretarial Order No. 3197, the Secretary of Interior then transferred OTFM and certain other Agency personnel, with responsibility for managing and administering trust funds, from the BIA to OST in 1996.

11.     Another significant trust reform measure in the post-1994 period relates to the consolidation and safeguarding of Indian records. To date, Interior has indexed and consolidated over 156,000 boxes of inactive Indian-related records, containing an estimated 392 million pages, at the American Indian Records Repository (AIRR) in Lenexa, Kansas.[4] The AIRR is a national repository for American Indian records created in 2004 pursuant to a Memorandum of Understanding between Interior and the National Archives and Records Administration (NARA). Well over half of these boxes contain records pertaining to trust funds and trust assets, while the remainder relate to other BIA programs (such as law enforcement, education and general administration). A significant number of additional boxes of Indian-related records are retained at various other NARA Federal Record Centers and at National Archives such as that in Washington, D.C., as well as at various Interior and Treasury offices across the country.

## Current Accounting Work

12.     As noted above, on April 1, 1995, OTFM began using the Omnitrust system, a commercial trust management system, to account for activity in tribal trust fund accounts, including financial investment holdings. OTFM used Omnitrust to report receipt, disbursement and investment activity to the tribes. The Omnitrust account statements also provided tribes with detail about investment purchases, maturities, and earnings, as well as information about tribes'

---

4 Inactive records are those that are no longer required for the agency's day-to-day activities and that have met the applicable schedule for retirement.

financial investment holdings, as of the date of each statement.

13.    Since OST assumed responsibility for trust funds management in 1996, it has been

performing the current accounting activities.  One important outcome of that current accounting

work is the preparation and delivery of periodic statements of performance, which are required

by the American Indian Trust Fund Management Reform Act of 1994 (the 1994 Act) to be sent at

least quarterly (although tribes may request more frequent statements, and the majority of tribes

are receiving monthly statements).  Statements of performance include information such as types

of receipts, income and disbursements; beginning and ending balances; and financial investment

holdings including earnings, gains and losses.

14.    In 1998, OST began converting trust accounts into the Trust 3000 system, commonly

referred to as the Trust Fund Accounting System (TFAS).  OST converted tribal trust accounts

to TFAS in March 1, 1999.  TFAS facilitates regular reporting to tribes concerning their trust

funds and investment activities.  In addition to the statements of performance described above,

TFAS also provides Interior with reconciliation tools for daily activity.  This daily activity is then

reconciled with the daily financial activity posted at Treasury.  Interior's reporting to tribes also

includes detailed information about the investments held for each account.  On a monthly basis,

OST reconciles financial investment holdings on TFAS to the custodian holding the securities.

Interior works continuously to make key improvements in its trust fund accounting systems and

controls.

### Tribal Work of the Office of Historical Trust Accounting

15.    By Secretarial Order No. 2321, the Secretary of the Interior on July 10, 2001, established

the Office of Historical Trust Accounting (OHTA) within the Office of the Secretary, and

initially charged it with the responsibility to plan, organize, direct, and execute the historical

accounting for IIM account holders. In July 2002, the Order was amended to expand OHTA's

responsibility to include tribal historical accountings. OHTA now performs its historical

accounting work under my direction and oversight, as of June 25, 2007.

16.     Between 2002-2006, OHTA's tribal work focused largely on the specific issues and

questions raised by those tribes that had filed cases prior to December 2006. Rather than proceed

with active litigation, most of those tribes expressed a preference for working with Interior in the

context of settlement negotiations (including ADR). As part of this process, OHTA has provided

briefings on the TRP to these and other tribes; has examined the TRP work papers of Andersen

as well as related document collections; and has prepared various accounting analyses and data

compilations of trust account-related materials. In addition, OHTA has collected a wide variety

of documents to reconcile or otherwise explain tribal transactions, including for periods before

the 1972 start of the TRP (that is, during the Tribal Paper Ledger Era). It also has performed

work to (1) aggregate historical electronic transaction data in such a way that it can be compared

to a control source (i.e., contemporaneous account statements produced for, or by, BIA and/or

OST) and (2) test the data to ensure that aggregate fund balances roll forward appropriately

across reporting periods and from one system to another. The ultimate goal of this work is to

compile transaction records and data from disparate historical systems into a single, uniform data

set that will facilitate analyses and tests of transaction data and account balances.

17.     In the years from 2003 to the present, OHTA also has worked to develop a programmatic

approach to tribal accounting issues for tribes, including tribes that had not filed cases prior to

December 2006. As one important project, OHTA entered into a Cooperative Agreement with

ITMA in 2004. OHTA has provided financial support under the terms of the Cooperative Agreement that has enabled ITMA to hire accountants and other experts to help seven of its member tribes (who were selected by ITMA) to participate in this Project to better understand their TRP results and then work with OHTA to develop a methodology that aims to produce information to resolve any still-disputed tribal account balances. To date, the Project has produced a draft methodology that proposes to test disbursements, evaluate investments and assess the completeness of tribal accounts.

18.      OHTA also has used statistical sampling methods to reach valid conclusions on the accuracy of land-based IIM accounts and to reduce the costs and time of reaching those conclusions. The cost of reconciling a single account transaction may well exceed the amount of many transactions at issue. Similarly, OHTA expects to decide whether and how to utilize statistical sampling methods to test the accuracy and completeness of tribal trust fund accounts. Under my direction, OHTA will evaluate its "lessons learned" from the various accounting-related tasks it has performed to date as Interior assesses and defines the nature and extent of its tribal accounting work during remand.

**The "Regulatory Initiative"**

19.      Interior routinely engages in Government-to-Government consultations with federally-recognized tribal nations, as all federal agencies are required to do by, for example, various Presidential directives and Executive Orders.[5] Beginning in 2004, Interior began to consult with tribes on the development of regulations intended to establish an administrative agency process

---

5  *See, e.g.,*. Exec. Order No. 13175, 65 Fed. Reg. 67249 ("Consultation and Coordination with Indian Tribal Governments") (Nov. 6, 2000) *and* Pres. Mem. of April 29, 1994, 59 Fed. Reg. 22951 (*both reprinted in* 25 U.S.C. § 450).

for resolving trust account holder questions or concerns about their trust funds accountings.

Interior first described the concepts of this draft regulation in a September 2004 letter to the

leaders of federally-recognized tribes, which I co-signed.  However, Interior received written

comments from only four tribes in response, and all requested more specific information on this

proposal.  On December 27, 2005, and again on July 7, 2006, Interior next shared copies of the

preliminary draft of the regulatory language with the leaders of federally-recognized tribes as

well as other organizations in Indian Country, again seeking comments and recommendations.

Interior also presented those preliminary drafts to and sought comments from tribes at three tribal

consultation meetings - in Albuquerque, New Mexico, on February 14, 2006, in Portland,

Oregon, on August 15, 2006, and again in Albuquerque on August 17, 2006.  The comments we

received during (and after) these tribal consultation meetings identified several issues that

continue to influence Interior's consideration of the manner in which it will produce accountings

for tribes.  Interior expects to decide whether and how to proceed with this rule-making process

as part of the work it will undertake during the remand period.

### Interior's Request for Voluntary Remand

20.     I am committed to ensuring that Interior provides tribes with historical accountings in

accordance with its understandings and interpretations of applicable law.  Interior seeks remand

at this time so that it may further consider, and act upon, the implications of certain recent factual

and policy developments, particularly with respect to the *Cobell* litigation (including the various

judicial decisions as well as the upcoming October 2007 trial) and the anticipated impacts of the

many new tribal suits filed in December 2006.

21.     More specifically,  Interior seeks remand so that it may apply the tribal accounting

13

expertise it has developed as the result of its 2002-2006 accounting-related work with the earliest

tribal trust plaintiffs, the insights gained from its 2004-06 consultations on the Regulatory

Initiative, and other factors (such as those I have described in this declaration) to prepare its

fully-articulated explanations of the features of an historic accounting for tribes that it deems

compliant with law.   In doing so, Interior also welcomes and will give due consideration to all

specifications that may be made by the Tribes of any defects they believe exist in any financial

information Interior previously has provided to them (including, but not limited to, the TRP

results, account statements and source documents).

### Considerations to be Addressed in Providing Historical Accountings to Tribes

22.     Interior intends to prepare an accounting plan and accompanying record that fully

articulates its understanding and interpretations of its various tribal accounting duties under law.

In producing the plan, among other issues and questions, Interior will consider various factors

such as, but not limited to, whether or how:

- prior accountings, reconciliation, auditing and reporting efforts by Interior, other government agencies and private accountants may be relied upon in the present accounting effort, particularly in avoiding duplicative efforts by Interior;

- to conduct a formal cost benefit analysis of the value of any further work;

- to determine accurate cash balances in tribal accounts, such as by analyses and tests (including but not limited to those that use statistical sampling methods) of the accuracy and completeness of the postings to accounts;

- to determine the types, quantity and quality of documents necessary for the analyses and tests of the accuracy and completeness of the postings to accounts;

- to present accounting information to each tribe and determine the degree of detail to provide for each transaction;

- to include other accounts in the accounting, such as tribal IIM accounts and closed

accounts;

- to establish a starting and ending date for the tribal accountings, which may vary by tribe or account;

- to conduct and incorporate into its accountings a review and accounting of non-monetary assets, such as real property and natural resources;

- to sequence its accountings - such as by tribe, account type, time period, sample basis, revenue source, or pilot scale and full scale testing;

- to solicit the input of tribes into accounting issues raised by tribes and the exceptions they have raised to accounting products provided to date;

- to incorporate ADR, other negotiation processes, and exceptions to any general rules for tribal accountings into its plan and process for administratively completing accountings;

- to allocate its budget among settlement efforts, litigation support, and formal tribal accountings, as well as between tribal and IIM work;

- to promulgate a formal rule to cover some or all of these matters, including an administrative appeal process;

- to address prior reports criticizing Interior's trust asset management and accounting;

- other applicable law, such as the Indian Claims Commission Act, the Interior appropriations riders and acts and many aspects of Title 25 of the United States Code regarding trust asset management, affects the determination of what accounting is owed;

- a tribe's response or failure to respond to the TRP affects its claim to any further accounting; and

- to exercise its discretion as to other aspects of the accounting to the extent permitted by law.

23.    Further, in the tribal accounting plan, Interior will analyze and evaluate the similarities and differences between IIM accountings and those that have been and will be performed for tribal accounts.  In conducting this analysis and evaluation, Interior will examine closely all of the relevant characteristics of each tribe.  Unlike the IIM account holders, tribes with tribal trust

15

fund accounts were provided the results of the TRP which included, among other things, a

statement of account balances as of a given date and accompanying requests to verify the

accuracy of that stated balance.

24.    In contrast to the IIM accountings, tribal accountings also implicate the Government-to-

Government relationship that exists between the federal government and each individual tribe.

The Indian Reorganization Act of 1934 ( c. 576, 48 Stat. 984, *codified as amended at* 25 U.S.C.

§§ 461 *et seq*.) and other laws have given tribes a great deal of autonomy over the management

of their trust assets.    Some tribes have existed continuously as sovereign entities since time

immemorial, and have trust assets dating back to the nineteenth century; others have been

federally-recognized only in recent decades.    Some tribes have considerable assets, others very

few; some tribes have only a single trust account, consisting perhaps of a judgment fund; others

have multiple types of accounts, dating from different times and containing funds from different

sources (such as timber or other natural resource revenues).    Tribes also play significant roles in

leasing and other asset management decisions, many through their own corporations, and they

reside in close proximity to their assets (unlike individuals, who can live thousands of miles

away from their often-fractionated assets).    Thus, each tribe has a potentially different starting

date for the historical accountings of each of its accounts, depending upon factors such as when

that account was opened, the effect of the Indian Claims Commission Act, and whether any tribal

rights to an accounting as to any specific tribal account have been extinguished through

litigation.

25.    Interior currently maintains approximately 1,450 tribal trust fund accounts for over 300

different tribal entities, as contrasted with the approximately 365,000 IIM accounts implicated in

16

the *Cobell* litigation. I understand that, as of September 30, 2006, the total trust fund balances held for tribes exceeds $2.9 billion, six times more than that held for individual Indians.[6] The dollar throughput for a tribal trust account generally is much greater than that for any single individual Indian's account. All of these and other distinctions in turn may affect Interior's resolution of issues such as the cost-benefit analysis that will most certainly be a part of its decision-making about the performance of particular accounting or reconciliation tasks.

26.    As part of its tribal accounting plan, Interior will review and address the tribes' non-monetary trust asset accounting claims. The review and determination requires Interior to consider and decide numerous factual issues. For instance, some tribes have never had any land held in trust for them by the United States, while some tribes have land-based assets which are not now, or at various times have not been, under federal management and control, but instead are or have been held and entirely managed by those tribes themselves. Interior needs to determine the level of land-based or non-monetary asset accountings owed to those tribes in those situations. Interior also needs to examine and determine the significance and impact, if any, of all of the already-existing accounting-related products that have been available to the tribes.

---

6 According to the *U.S. Department of Interior Office of the Inspector General: Independent Auditors' Report on the Tribal and Other Trust Funds and Individual Indian Monies Trust Funds Financial Statements for Fiscal Years 2006 and 2005 Managed by the Office of the Special Trustee for American Indians, Report No. Q-IN-OST-0001-2006.*

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 10, 2007.

ROSS O. SWIMMER