# ATTACHMENT C

# TO BOSWELL

# DECLARATION

# PART 3

## Advisory Board Proposals In Response to Tribal Trust Fund

## Reconciliation Project

PROPOSED LEGISLATION
IN RESPONSE TO TRIBAL TRUST FUND RECONCILIATION RESULTS
AND TO ADDRESS SOLUTIONS TO THE MAJOR TRUST MANAGEMENT
PROBLEMS

## INTRODUCTION AND PURPOSE

This paper presents a proposal for legislation in response to the Bureau of Indian Affairs' (BIA) Tribal Trust Fund Reconciliation Project (Reconciliation Project), to major problems affecting American Indian trust management and to the statutory requirements of the American Indian Trust Fund Management Reform Act of 1994 (Reform Act of 1994).

The Reform Act of 1994 provides that the Secretary of the Interior (Secretary) shall prepare a report which must include a description of the procedures used for reconciliation of the Tribal trust fund accounts and a statement outlining efforts the Secretary will undertake to resolve disputes regarding Tribal account balances arising out of the Tribal trust fund reconciliation process. The Secretary provided an interim report to Congress on May 31, 1996.

As the Secretary's Report indicates, commencing in January 1996, each tribal account holder was provided a report on the reconciliation of its accounts along with account statements that show account balances, reconciled transactions, and proposed adjustments. Subsequent to the distribution of the reconciliation report and account statements, a national meeting, to which all account holders were invited, was held in Albuquerque, New Mexico, to explain the reconciliation methodology and the report and account statement format, content and terminology. A series of five (5) regional meetings were also scheduled during the spring and summer of 1996 to work directly with each account holder to address questions and issues on its specific report and account statements.

Through April 30, 1996, seventy-seven (77) of the 280 tribes involved in the reconciliation project have responded. Specifically, two (2) account holders have accepted and three (3) account holders have disputed their account balances. Because by the end of May all of the scheduled meetings had not been held to receive and discuss account holder issues and comments and since many account holders had not communicated their acceptance or dispute of their account balances, only an interim report on the account holders' attestations was provided in the Secretary's Report. The Department of the Interior (Department) testified in June that it will be in a position to propose a mechanism to resolve any disputes sometime during the fall of 1996 and that a final report on account holder attestations and a mechanism to resolve any disputes will be submitted to the Congress by November 15, 1996. The mechanism to resolve any disputes will almost certainly take the form of proposed legislation. Legislation would provide an orderly and efficient mechanism for resolution of the disputes over account balances arising out of the Tribal trust fund account reconciliation process, would respond to the statutory directive that the Secretary outline efforts to resolve such disputes and because claims arising out of the Reconciliation Project will probably substantially exceed the Department's financial resources.

1

**Need for a Comprehensive Settlement and Solution to Trust Management Problems**

This proposal presents a comprehensive set of settlements and initiatives which are designed to compensate American Indian trust beneficiaries for damages from past trust management practices and assure an accurate and timely accounting to trust account holders in the future.

In October 1995 the Office of the Special Trustee for American Indians (OST) commenced an assessment of the U. S. Government's trust management policies, procedures, practices and systems as they apply to individual American Indian and American Indian tribal accounts.

By February 1996 the OST completed the preliminary assessment and produced a conceptual Strategic Plan to acquire and institutionalize specified systems. Implementation of this plan will permit and ensure that the U. S. Government establishes appropriate policies and procedures, develops necessary systems and takes the affirmative actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries. In this manner the proper discharge of the Secretary's trust responsibilities finally can be accomplished. The Assessment and Phase I of the Strategic Plan are attached in a document entitled "Special Trustee for American Indians, Assessment and Strategic Plan Principles, Phase I, February 1996" (Special Trustee's Assessment or Special Trustee's Strategic Plan).

In December 1995 the Department's Bureau of Indian Affairs (BIA) substantially completed a multi-year "Tribal Trust Funds Reconciliation Project" (Reconciliation Project) and issued an "Agreed-Upon Procedures and Findings Report" for the period July 1, 1972 through September 30, 1992.

In August 1995 the Department substantially completed a study of the trust management systems relating to Individual Indian Monies (IIM) accounts and issued a report entitled "IIM Related Systems Improvement Project Report." The findings of this report are substantially incorporated in the Special Trustee's Assessment.

The Special Trustee's Assessment, the Reconciliation Project reports, the IIM Related System Improvement Project Report and earlier reports issued by the General Accounting Office all confirm that the U. S. Government's trust management systems, policies, procedures and practices coupled with the condition of the trust records and, notably, large numbers of missing documents, effectively prevent:

1. a proper, accurate and timely accounting for trust account balances, collections, disbursements and investments and the maximization of the return on investments.

2. the preparation of accurate and timely reports to trust account holders regarding all collections, disbursements, investments and return on investments.

2

3. an audit under generally accepted auditing standards.

4. any further reconciliation efforts, since the costs of such efforts would substantially exceed the benefits and at the same time would probably yield unsatisfactory and inconclusive results.

The past and present undeniably poor quality of the trust management systems, the condition of the historical records and the U. S. Government's inability to provide an accurate and timely accounting prevent any reasonably accurate determination of the extent of harm, damage or loss to American Indian trust beneficiaries. For example, the Reconciliation Project disclosed there were no records located to support $2.4 billion out of $17.7 billion for the twenty year period (1972 - 1992) for one category of transactions (non-investment transactions). In addition, it appears that the condition of the records and the quality of the trust management systems were much worse for periods prior to 1972. Therefore, it is reasonable to assume that several billion dollars more in unlocated documents and substantially more harm, damage and loss would have been disclosed had a full reconciliation or full accounting been possible for periods prior to 1972.

It is undeniable that some compensation is due the American Indian account beneficiaries for the U. S. Government's inability to provide an accurate and timely accounting and such compensation could be justified in the billions of dollars. But, even if the damages could be reasonably estimated, there would remain the question of which American Indians were harmed and damaged? There is no complete answer to that question and since there is not, any settlement of claims, present and prospective, arising out of the U. S. Government's inability to render an accurate and timely accounting or the Reconciliation Project or both, necessarily must start with the settlement of known and quantifiable harm, damage and loss and proceed to a subjective, common sense settlement process for the other harm, damage and loss which may have accrued to trust account holders over many, many years.

Any settlement process would also be inadequate unless it addressed the root causes of the Government's inability to provide an accurate and timely accounting to American Indian trust beneficiaries. That is why the Special Trustee's Strategic Plan is an integral part of the settlement process. Implementation of this plan will ensure that the U. S. Government establishes appropriate policies and procedures, develops necessary systems and takes the affirmative actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries in the future. In this manner the proper discharge of the Secretary's trust responsibilities finally can be accomplished.

Consistent with the general approach just described, the following pages describe specific settlement terms and amounts, the criteria to be used and the rationale for each general settlement.

3

## II. BACKGROUND

The Secretary of the Interior has been designated by Congress as the trustee of the funds held by the federal government for Indian Tribes and individual American Indians. Therefore, the Secretary has a responsibility to ensure the proper accounting, investment and financial reporting of approximately 300,000 Tribal and IIM trust accounts.

Accordingly, the Department of the Interior through the Bureau of Indian Affairs and the Office of the Special Trustee for American Indians has a responsibility to ensure that the trust accounts are properly maintained and invested in accordance with applicable laws, and that accurate and complete accountings and reports are periodically provided to fund owners.

Over the past decade, operational reviews and financial audits have identified weaknesses in the control and oversight of Indian trust funds. A primary concern was the failure to reconcile the trust fund accounts regularly. Accordingly, in 1988, 1989 and 1990, Congress directed BIA to take steps to reconcile Indian trust fund accounts as accurately as possible back to the earliest practical date. The FY 1990 appropriations language further specified the requirement that "the results of such reconciliation have been certified by an independent party as the most complete reconciliation of such funds as possible."

Pursuant to these directives, BIA commenced its reconciliation project in 1990. In the fall of 1990, an ad hoc Tribal advisory group worked in conjunction with the General Accounting Office (GAO) and the Department's Inspector General to develop a request for proposal for the reconciliation contract. In May 1991, the contract was awarded to a national accounting firm, Arthur Andersen, L.L.P. The ad hoc group constituted itself as the Intertribal Monitoring Association (ITMA).

Phase I of the contract was intended to determine what records were available, what procedures would be necessary, and what was the cost of a complete reconciliation for both the Tribal trust and IIM accounts. This work was performed from June 1991 through January 1992. The results of Phase I disclosed that all supporting documents could not be located, but to the extent they could be located, they could be examined. Because some records could not be located, it was resolved that an audit would not produce meaningful results.

In view of this, the Department of the Interior, in consultation with the Office of Management and Budget (OMB) and ITMA, considered alternative methodologies and approaches with the goal of producing as accurate an accounting as practicable. As a result, the BIA modified the Arthur Andersen contract to incorporate the agreed-upon procedures methodology, which does not constitute an audit in accordance with generally accepted auditing standards but was used to reconcile the Tribal trust fund accounts back to 1973.

The Reconciliation Project did not address IIM accounts because it was determined that a similar reconciliation effort for IIM accounts would cost $108 to $281 million.

4

In accord with the Congressional mandate that the Tribal trust reconciliation be certified by an independent third party, the BIA awarded a contract to perform the certification to Coopers and Lybrand in September 1993. Due to difficulties with the contractor and a projected cost for completion of the certification that far exceeded initial estimates, BIA terminated the contract in October 1995, before the certification was completed. At BIA's request, Coopers and Lybrand provided a close-out letter summarizing the work performed prior to termination. In the letter, Coopers states that it noted errors in certain aspects of Arthur Andersen's reconciliation work under the BIA contract, and that some but not all of these errors were reported to Arthur Andersen and BIA. The letter further states, however, that no conclusions can be drawn from the preliminary information reported because Coopers did not complete the certification work or finalize the results.

While the BIA reconciliation efforts were ongoing, in 1994, Congress passed the American Indian Trust Fund Management Reform Act, 25 U.S.C. 4001-4061, which established the Office of the Special Trustee for American Indians. The Special Trustee, who reports directly to the Secretary, is responsible for oversight, reform, and coordination of the policies, procedures, systems and practices used by various Departmental agencies in managing Indian trust monies. The statute also required that the Secretary transmit to Congress by May 31, 1996, a report that describes the methodology and results of the trust fund reconciliation process, includes Tribal attestations as to disputed account balances, and outlines efforts the Secretary will undertake to resolve such disputes.

In January 1996, OTFM released to approximately 280 Tribes a report summarizing the results of its Tribal Trust Funds Reconciliation Project. The agreed-upon procedures used in the reconciliation were intended to accomplish the following: (1) verify that financial transactions posted to the accounting records are in agreement with the originating lease or sale agreements, permits, or contract terms (not completed for all transactions); (2) determine the timeliness of the deposit of receipts (for informational purposes only); (3) verify that non-investment financial transactions posted to the BIA's official accounting records are in agreement with supporting financial source documents; (4) assess the reasonableness of investment income posted to Tribal accounts; (5) assess the reasonableness of U.S. Treasury interest calculations; and (6) reconcile accounting systems and general ledger balances with U.S. Treasury balances. The report indicated that there were some $2.4 billion in unreconciled non-investment transactions (transactions for which supporting financial source documents cannot be located). The procedures and the proposed adjustments to account balances are detailed in the Reconciliation Report, and were explained to the Tribes at a national meeting on February 14 and 15 in Albuquerque, New Mexico. More detailed follow-up was provided at a series of regional meetings with individual Tribes.

As noted, the Department has indicated it will be in a position to propose a mechanism to resolve any disputes sometime during the fall of 1996 and that a final report on account holder attestations and a mechanism to resolve any disputes will be submitted to the Congress by November 15, 1996.

5

0590

## III. TYPES OF CLAIMS AND SETTLEMENTS

For purposes of this paper, the two basic types of potential claims that may arise from the Reconciliation Project or otherwise are referred to as Type 1 or Type 2 claims.

Type 1 claims are claims based on exceptions or errors for which the government has adequate documentation and agrees that either funds are owed to a Tribal account or that funds are owed from a Tribal account to the government. These claims are described in the Reconciliation Project Reports or otherwise as set forth in the legislation.

Type 1 claims also include claims where a Tribe disputes its account balance from reconciliation and brings a claim which can be negotiated, mediated or arbitrated. These claims can be based on additional documentation produced by the Tribe or the government in addressing Reconciliation Project issues, other claims of a similar nature or certain reconciled disbursement transactions without complete disbursement packages which can be quantified to some extent and examined for reasonableness.

Type 2 claims are claims arising from all other circumstances and include unreconciled transactions, where neither the Tribe nor BIA can locate adequate source documentation to support the account transactions or balance or to support a conclusion that those transactions or balances are in error. Type 2 claims would address not only those claims arising from BIA's Tribal trust fund reconciliation, but would include claims and settlement amounts arising from other trust management issues that need to be addressed and resolved. These include claims arising from the IIM accounts for all periods up to settlement and from the Tribal accounts outside the 20-year tribal reconciliation period, as well as issues pertaining to the Department's existing trust management practices and the OST's reform efforts.

Settlements involve payment for both specific and general claims and deficiencies. Settlement proceeds include direct distribution to Tribes or IIM account holders where specific settlements can be reasonably supported based on the factual situation. Where damages cannot be reasonably estimated for particular individuals or Tribes, settlement proceeds are distributed to remedy trust management deficiencies or to provide for other initiatives which will benefit substantially all trust beneficiaries.

## IV. PROPOSALS FOR SETTLEMENT OF SPECIFIC CLAIMS

### A. General Framework

The general framework for resolution of claims arising from the reconciliation must be legislative. The legislative options described below would provide for the expedited payment of claims from the Judgment Fund or otherwise as specified for particular settlements.

All agreed Type 1 claims would be paid in full with interest, and with forgiveness of any amounts that may be owed by Tribes, and without regard to the settlement of Type 2 or any other

6

claims. Payments would be made promptly after the legislation takes effect in accordance with procedures and guidelines set forth in the legislation.

Type 2 claims would be settled and paid based on specific and general settlements and guidelines set by the legislation.

Tribes that settled their Type 2 claims pursuant to the legislative procedure would waive all claims related to Tribal trust funds administered by the BIA for the period prior to September 30, 1995. Account balances, adjusted by the agreed claim amounts, would be accepted as of September 30, 1995 and would be used as the basis for future accountings. The government subsequently would not be required to perform further accountings or reconciliation exercises for periods prior to September 30, 1995. Nor would the government be liable for past damages arising from trust management practices prior to September 30, 1995. Tribes that did not resolve their claims pursuant to the legislative procedure would be able to bring their claims in court, consistent with certain parameters for those claims set out in the legislation but would not be able to participate in the Type 2 settlements. Settlement for IIM damages or losses would be as of a certain date specified in the legislation with IIM balances deemed to be accepted as accurate as of that date. Such a date would be used as a basis for future accountings.

## B. Detailed Discussion of Proposed Settlement for Legislation

It is clear from an examination of existing authorities regarding settlement of claims, forgiveness and offset of claims, payment of interest and available funding that a legislative solution is necessary to address Tribal claims arising from the reconciliation results and other trust management issues. The following framework should be considered to settle the two types of Tribal claims:

## General Payment Policies

**Payment of All Agreed Claims.** All agreed claims will be settled under policies and guidelines where the government agrees to pay specific settlement amounts to the Tribes. These include all Proposed and Scoped Adjustments, Roll-forward Adjustments and interest on deposits due to lag times between collection and deposit as set forth in the Reconciliation Project Reports. Other agreed Type 1 claims which have been settled by negotiation, mediation or arbitration will also be paid directly to the Tribes. Also included will be specific payments to beneficiaries with unreconciled disbursements as set forth in the legislation. All agreed settled claims should be paid promptly within a specified period of time set forth in the legislation. The government would pay the Tribe any principal amounts owed, plus interest, compounded from the date of the error to the date the payment is made or otherwise as set forth in legislation.

**Interest Policy.** There are various ways to compute interest. The fairest method with parallels in the private sector would determine interest payments by computing compound interest at a blended Tribal benchmark rate. This interest payment would be

7

greater than what a tribe could likely recover in court, because the courts have limited the interest amount on trust funds to simple interest on principal only, and because the Tribal benchmark rate is skewed somewhat by a number of long-term instruments held by one tribe. Other market indexed rates may also be used for certain time periods and in particular circumstances.

**Forgiveness Policy.** The reconciliation results indicate that in some cases errors resulted in overpayments or erroneous payments to a tribe or a particular Tribal account. One option is to require tribes to reimburse BIA for amounts erroneously credited to their accounts, with or without interest. However, forgiveness of the entire amount is proposed for the following reasons:

A. These are known and admitted errors of the U. S. Government. Even though the tribes apparently benefitted by these overpayments, they should not be asked to repay amounts which arose out of the U. S. Government's inability to provide an accurate and timely accounting to tribal trust account beneficiaries.

B. These admitted errors were made over twenty years. The usual and customary standards for clearing similar exception items in the private sector is one accounting period, usually ninety days or less. After ninety days, private trust companies usually do not charge their customers for errors committed by the trust companies even though the customers may have benefitted from such errors. The U. S. Government should not adopt a lower standard for itself by seeking restitution from the tribes for these overpayments.

C. The overpayments were identified reconciled items, only. Had a full accounting been possible for the over $2.4 billion in unreconciled non-investment transactions (documentation which could not be located), or had a full accounting been possible in verifying financial transactions to source documents (such as land leases and contracts), or had the Reconciliation Project covered different time periods, the net results for particular tribes might have been different. Errors such as overpayments for particular tribes might have been offset in whole or in part by errors resulting in amounts due to the same tribes had a full accounting been possible or had the Reconciliation Project used different time frames.

D. Overpayments or other exceptions resulting in an amount due from tribes were not researched fully to determine whether a subsequent correcting entry was made by the BIA. Tribes should not be asked to reimburse the government for these amounts unless the government can document that no subsequent correcting entry was made.

8

Given the conditions which have prevented the U. S. Government from rendering an accurate and timely accounting, the U. S. Government should not seek restitution for admitted errors which apparently benefited certain trust beneficiaries which are based on results from a Reconciliation Project with undeniable shortcomings.

No appropriated money will be required for this settlement.

**Netting Policy.** A significant policy consideration that would affect any of the settlement options described above is how the Department should account for amounts owed to a tribe based on the reconciliation results for one or more accounts versus amounts due the United States based on the reconciliation results of one or more different accounts of the same tribe.

Under a no-netting approach, the Department would forgive all amounts that were overpaid to tribes and pay all amounts owed to Tribes plus interest. This approach would require the greatest amount of funds to pay claims.

Under a netting to the tribal level approach, adjustments for all accounts of the same tribe would be netted against each other to arrive at the net amount due to or owed by a tribe. While the least costly approach from the government's point of view, this approach has the distinct disadvantage of netting accounts which may have been set up with a specific purpose in mind (e.g., general tribal funds and judgment funds) or which benefit a specific class of beneficiaries (e.g., all tribal members, specific tribal members, minors) against accounts of the same tribe with a different purpose or which benefit a different class of beneficiary.

The proposed approach would net all amounts owed to a tribe against all amounts due from a tribe for each account of the tribe, but would not net adjustments for all accounts of the same tribe against each other. This is obviously the fairest way to proceed in arriving at the net amount due to or owed by a tribe.

**Waiver/Review.** Tribes that accept payment of Type 2 claims under this settlement process would waive bringing any further claims as part of any subsequent litigation.

**Funding/Cost.** All claims should be paid from the Judgment Fund.

## 1. Payment of Type 1 Claims

Type 1 claims are those where the Department agrees to a specific settlement amount. These include all Proposed and Scoped Adjustments. Roll-forward Adjustments and interest on deposits due to lag times between collection and deposit as set forth in the Reconciliation Project Reports. Because the government has an obligation to correct its known errors, all such claims should be paid promptly within a specified period of time as set forth in legislation. The government would pay the tribe any principal amounts owed, plus compounded interest from the

9

date of the error to the date the payment is made or otherwise as set forth in legislation. The following is a summary and estimate of Type 1 claims and settlement estimates. In accordance with the general policy Type I claims due from tribes would be forgiven.

10

Type 1 Claims
Settlement Estimate
($ millions)

| Type 1 Settlement Category | Principal | Interest | Total |
|---|---|---|---|
| **1-1.  Due From Tribes: Forgiven** | | | |
| 1-1A.  Proposed Adjustments | 11.6 | 11.6 | 23.2 |
| 1-1B.  Rollover Amounts | 26.1 | 116.9 | 143.0 |
| Total Forgiven | 37.7 | 128.5 | 166.2 |

Note:   Total Forgiven amount does not require
appropriations or payment from the
Judgment Fund.

| | Principal | Interest | Total |
|---|---|---|---|
| **1-2.  Due to Tribes** | | | |
| 1-2A.  Proposed Adjustments | 10.6 | 14.5 | 25.1 |
| 1-2B.  Rollover Amounts | 17.5 | 92.1 | 109.6 |
| Sub-total | 28.1 | 106.6 | 134.7 |
| 1-2C.  Interest on Deposits Due to Lag Times Between Collection and Deposit (BIA) | | 8.2 | 8.2 |
| 1-2D.  Interest on Deposits Due to Lag Times Between Deposit at Treasury and Credit to  Account of Beneficiary (MMS) | ___ | .5 | .5 |
| Sub-Total Due to Tribes under Settlement 1-2 | 28.1 | 115.3 | 143.4 |

11

0596

## 2. Evaluation and Payment of Type 1 Claims Resulting From Disputes

**Evaluation/Guidelines and Payment of Agreed Claims.** The Department would evaluate any Type 1 claims where the tribe disputes the account balance. The Tribe would be required to initiate a claim based on additional Tribal documentation the tribes may have. To the extent practical such documentation should be pursuant to the reconciliation standards employed by Arthur Andersen in the Reconciliation Project. Claims could also be initiated based on an analysis of reconciled disbursements without complete disbursement voucher packages. Type 1 claims could include challenges to "Passed Adjustments" contained in the Reconciliation Project Reports and other challenges to the Reconciliation Report findings.

The Department shall negotiate in good faith with any account holder who initiates a Type 1 claim in an attempt to reach agreement on the account balance and any adjustments prior to a mediator being appointed. If agreement is reached, the agreed claim would be settled under the general payment policies and procedures for Type 1 claims, including interest, forgiveness, netting, funding, etc., as set forth above.

**Negotiation/Mediation/Arbitration.** The Department shall enter into mediation with any account holder who disputes the balance of the account holder's account as reconciled and reported in the Reconciliation Report and any other Type 1 claim. The Department shall negotiate in good faith with the account holder to reach agreement on the balance of the account holder's account. Negotiating sessions may take place at any site agreed upon by both the Department and the account holder. If agreement cannot be reached within a reasonable period of time, upon notification from the Department, the Director of the Federal Mediation and Conciliation Service shall appoint a mediator to mediate the dispute. The time and frequency of negotiating sessions shall be determined by agreement of the Department, the account holder, and the mediator. Six months from the date mediation commences, the Department shall record, and the account holder and any other party of interest shall accept, as the balance accurate as of September 30, 1995, for any accounts submitted to negotiations under mediation, the account balance reported by the Secretary to the Congress in the Reconciliation Report under section 304 of Public Law 103-412, 108 Stat. 4239, 4248 (1994), unless:

1. The Department and the account holder enter into an agreement, prior to that date, stipulating the correct balance of the account and any agreed adjustments to the account; or

2. The account holder or his agent, prior to or on that date, notifies the Department and the mediator that he has decided to submit the dispute to binding arbitration for resolution or has decided to litigate the matter.

If binding arbitration is chosen, both the Department and the account holder must agree to it. The Department must not unreasonably withhold its consent to binding arbitration. Any arbitration proceeding shall be conducted by a panel of three arbitrators under rules established by legislation.

12

0597

The panel of arbitrators, in resolving an account holder's dispute. shall decide the appropriate balance of the account holder's account, and shall award amounts to either party as necessary to adjust the balance of the account holder's account. Awards may be limited by type, by aggregate amount, by individual tribe or otherwise as set forth by the Congress in legislation. Any payment to the account holder by the United States as a result of the decision shall be paid from the Judgment Fund and may be enforced by a federal district court.

The government should pay the expenses of mediation and arbitration for both parties under terms and conditions set forth in the legislation.

### Treatment and Limitations on Claims based on Reconciled Disbursements Without Complete Disbursement Voucher Packages

The Reconciliation Project Reports sent to each tribe contains a summary of the basic reconciliation disbursement transaction results for each tribe. Codes were assigned to reconciled disbursement transactions indicating the level of supporting documentation. In the aggregate approximately $6,035 million were categorized as "Reconciled" transactions. Of this amount, only $1,925 million were in the category in which the complete disbursement voucher package was reconciled. $4,110 million involved reconciled transactions with incomplete disbursement voucher packages. Some of these incomplete disbursement packages may not constitute "proof of payment" as that term is understood in the private sector. As a result claims may be pursued by individual tribes seeking restitution for these poorly documented transactions. Because some degree of proof of payment exists and because the tribes now have access to the images and the documentation for all these transactions, the burden of bringing a claim should fall on the tribes. In addition, most of these transactions are supported by at least one valid authorization. The probability that the tribes suffered a loss or other damage from these incomplete disbursement voucher packages, while significant, is most likely less than 10%.

An aggregate settlement of $400 million seems appropriate. This is approximately 10% of the $4,110 million in reconciled transactions with incomplete disbursement packages. In addition, if an accounting were ordered to establish "proof of payment" for all reconciled transactions without complete disbursements packages, the government might have to spend similar amounts in the accounting alone. It is proposed that $200 million be earmarked as a general Type 2 claim settlement with the proceeds to be used as part of the initial capital of the development bank proposed as part of the Type 2-7A claims settlement proposal. $200 million should be earmarked to satisfy any individual claims brought by Tribes based on these transactions. Individual awards to a Tribe agreed to by the Department or compelled by the Arbitration process for Type 1 claims of this nature should be limited to no more than 5% of the total reconciled transactions with incomplete disbursement packages for that Tribe.

**Timing.** Evaluation of Type 1 claims would occur simultaneously with calculation of the Type 1 settlement amount, so that if a tribe presented adequate documentation to merit an agreed adjustment, that adjustment and other Type 1 claims could be included as part of the settlement of its Type 1 claims. However, payment of agreed Type 1 claims should not be delayed for

13

those tribes choosing to bring a claim under the procedures established for other Type 1 claims.

In keeping with general policy. Type 1 claims due from tribes for Passed Adjustments would be forgiven.

The following table is a summary of Type 1 Claims and Settlements arising from disputes.

14

Type 1 Claims
Settlement Estimate
($ millions)

| Type 1 Settlement Category | | Principal | Interest | Total |
|---|---|---|---|---|
| 1-3. Due From Tribes: Forgiven | | | | |
| Passed Adjustments: | | | | |
| Principal | 7.6 | | | |
| Interest | 25.4 | | | |
| Total | 33.0 | - | - | - |
| 1-4. Due To Tribes: | | | | |
| Passed Adjustments: | | | | |
| Principal | 3.4 | | | |
| Interest | 5.7 | | | |
| Total | 9.1 | (1) | (1) | (1) |
| 1-5. Disputed Claims Based on Additional Tribal Documentation and Due To Tribes Based on Negotiation, Mediation and Arbitration | | (1) | (1) | (1) |
| 1-6. Reconciled Disbursements with Incomplete Disbursement Voucher Packages | | | | |
| 1-6A. General Settlement of all potential liability for all reconciled disbursements with incomplete disbursement voucher packages. Proceeds will be used to capitalize partially the Development Bank (See Settlement 2-7). | | | | 200 |
| 1-6B. Reconciled Disbursements with Incomplete Disbursement Voucher Packages and Due To Tribes Based on Negotiation, Mediation and Arbitration. | | | | |
| Principal | 4,110 | (1) & (2) | (1) & (2) | 200 |
| Total Type 2 Exposure | | (1) & (2) | (1) &(2) | 400 |

(1) None unless tribes dispute the account balance and bring successful action and receive settlements based on negotiation, mediation or arbitration.

(2) It is proposed that the legislation cap the potential liability for Type 1-6B claims at $200 million. Individual awards to a tribe will be capped at 5% of the total reconciled transactions with incomplete disbursement packages for that tribe. The unused portion of the $200 million pool will be used to pay other Type 1 claims with any remaining balance reverting to the U. S. Treasury. General Settlement 1-6A for $200 million will be used to capitalize the development bank described in Settlement 2-7.

Attachment C Part 3 to Boswell Declaration          0600

### 3. Settlement of Type 2 Claims

There are two approaches to settlement of Type 2 claims. Under the first approach, an amount would be paid that reflects a Congressionally-determined amount for the specific Type 2 claims described below. A second approach provides for a general settlement of Type 2 claims with all or most IIM account holders and Tribes for all other covered issues and claims defined in the legislation.

The following section discusses the rationale and the terms and conditions for each proposed settlement of Type 2 claims.

16

# SPECIFIC TYPE 2 CLAIMS SETTLEMENTS

## Type 2-1: IIM Account Holders Settlement Proposal

Settlement 2-1:    1. $281 million
                   2. **Tax Free Status for IIM Accounts**

This amount of money would be used to compensate IIM account beneficiaries for any harm, damage or loss arising out of the government's inability to provide an accurate and timely accounting to IIM trust account holders.

Rationale:

A full discussion and assessment of IIM trust management systems are contained in the report entitled "IIM Related Systems Improvement Project Report" and in the Special Trustee's Assessment. Generally, both reports point to:

1. the poor condition of the IIM data bases and the lack of integrated and adequate systems.

2. the dependence on outdated manual systems and inconsistent automated systems.

3. the lack of documentation supporting subjective management decisions.

4. failures to address adequately large and unacceptable numbers of suspense items; accounting and reconciling errors and exceptions; accounts with no address or an incorrect address; duplicate accounts; retention of funds for minors over 18 years of age; dormant special accounts; and undistributed closed estates.

5. poor internal controls and inconsistent policies and practices.

6. a lack of appropriate audit trails.

7. an inability to trace deposits and collections to source documents.

8. large numbers of missing documents.

9. systems and processes which are not capable of establishing up-to-date and accurate land title records, necessary to the lease management process.

10. no accounts receivable system to assure that all income due is collected or that it is collected in a timely manner.

11. an organizational alignment which is ineffective at times.

17

The following Table is illustrative of the type and depth of problems affecting IIM trust management:

| IIM Exposure | No. Accts. | Liability Principal | Exposure |
|---|---|---|---|
| Balance as of 2/96 | 308,000 | $509 million | |

1. Problems

    A. 54,921 accounts without a known address — $44.9 million — Unknown
       Whereabouts Unknown over 7 years — $7.8 million — Unknown

    B. 15,230 accounts for former minors over 21 — $21.8 million — Unknown

    C. Overdraft Interest Clearing Accounts
       (Non-earning assets which deprive current IIM
       account holders of over $2 million annually),
       as of 8/29/96. — $42.2 million — $2million/yr

    D. 1,493 closed estates not distributed to
       heirs over 4 years — $0.419 million — Unknown

    E. 55% of accounts (170,262) have balance
       less than $10 which are maintained
       at significant cost to taxpayer. — Taxpayer Cost

    F. 36,917 accounts have had no activity
       during last eighteen months and are
       maintained at significant cost to taxpayer. — Taxpayer Cost

    G. At OTFM there are $28.3 million in general ledger
       differences, suspense differences, balancing
       differences, overdraft losses and miscellaneous
       losses which have not been cleared, as of 8/29/96. — $28.3 million

2. Interest owed to IIM account holders for 1980's thrift losses $13 million

3. Cost to reconcile IIM accounts: Contractor's 1992 estimate: $108 to $281 million

4. Risk of court ordered accounting/reconciliation — Unknown

5. Past IMPL exposure — Unknown

6. Other:

| | No. | Amount |
|---|---|---|
| Missing Social Security Numbers | 130,833 | $174,975,472 |
| Overdrafts IIM | 300 | 319,358 |
| Special Deposit Accounts | 26,087 | 135,987,085 |
| Special Deposit Accounts 0 Balance | 9,954 | |
| Special Deposit Overdrafts | 45 | 120,786 |
| Special Deposits - No Activity last 2 yrs. | 5,245 | 2,149,707 |
| J Accounts over 18 | 23,494 | 25,563,216 |
| J Accounts over 21 | 15,236 | 21,842,120 |

Whereabouts Unknown:

| | No. | Amount |
|---|---|---|
| $0 Balance | 4,286 | 0 |
| $0 to 50 | 26,066 | 381,100 |
| 50 to 100 | 4,409 | 322,013 |
| 100 to 1,000 | 14,382 | 5,749,547 |
| 1,000 to 5,000 | 3,982 | 8,536,362 |
| Over $5,000 | 1,785 | 30,004,307 |

Trust management system deficiencies and the poor condition of the records prevent a proper, accurate and timely accounting of IIM account balances, collections, deposits, disbursements, investments and return on investments.

Further, to conduct a reconciliation of the IIM accounts similar to that undertaken for tribal accounts during the recently completed Reconciliation Project would require between $108 million and $281 million according to estimates made by the Reconciliation Project primary contractor in 1992. This compares to approximately $20 million which was spent for the twenty year tribal Reconciliation Project. The reason the costs to reconcile are so much larger for IIM accounts is due to the large number of accounts and the fact that the IIM trust management systems and the condition of the IIM records are generally considered to be much worse than the systems and records applicable to tribal trust accounts. For example, substantially all of the IIM electronic financial records are missing prior to 1985. Therefore, even if a reconciliation effort were initiated for IIM accounts, it is unlikely that it would produce satisfactory or conclusive results or amount to an accounting sufficient to aid in the determination of harm, damage or loss to IIM account holders.

Rather than spend $108 million to $281 million to produce what is likely to be an unsatisfactory result, it is proposed that the larger amount or $281 million (Settlement 2-1) be specifically used to compensate IIM account beneficiaries for any harm, damage or loss arising out of the government's inability to provide an accurate and timely accounting to IIM trust account holders. This figure is not submitted as nor is it to be considered an appraisal of the actual damage and harm suffered by these account holders. This figure is based on the probable amount it would cost the trustee to produce an unsatisfactory reconcilement of these accounts. The actual damage figure may be materially different.

Since there is not a practical way equitably to allocate the settlement amount to individual account holders, past and present, it is proposed that all $281 million in principal be deposited in the IIM Investment Pool and subsequently invested for the benefit of IIM account holders. This would be a permanent fund and would also act as a reserve to pay claims successfully brought by individual account holders. Principal could not be withdrawn from the IIM Investment Pool, except to pay for individual claims successfully brought by IIM holders through litigation or otherwise.

Current and future IIM account holders would benefit by receiving the earnings on the permanent fund in the form of an increased yield on IIM account balances.

To further enhance their opportunity for higher yields on savings, to encourage savings and to allow previous IIM account holders an opportunity to participate, all IIM accounts will be converted to trust savings accounts with a checking account feature. Such accounts would retain all current account features, including the feature which permits disbursement of IIM deposits. IIM account holders would continue to receive all eligible disbursements as they do now or could elect to save all or a part of IIM monies to earn the extra yield provided by the $281 million permanent settlement fund. Voluntary deposits would be accepted from all current or past IIM account holders. Former IIM account holders could re-open accounts and deposit their savings to earn the higher yield as well. In addition all interest received by IIM account holders would be free of federal taxes by Act of Congress.

19

**Type 2-2: Restoration of IIM Thrift Industry Losses**

**Settlement 2-2:** S13 million, more or less.

This amount of money would restore to the IIM account holders $12.8 million, more or less, in interest that was not earned on over $5 million in principal that was lost as a result of failed investments by the BIA in the 1980s and not restored until recently.

Rationale:

The documentation for this settlement amount is contained in the Department of the Interior (Department) FY 1996 Budget Submission to Congress, wherein the Department requested appropriations of $12,668,000 to be used to restore interest that was not earned for IIM account holders because of principal that was lost as a result of investments from the IIM Investment Pool in uninsured obligations of failed credit unions and savings and loan associations.

The 12,668,000 is for the period from FY 1984 through FY 1995 and continues to increase at an amount of approximately $53,000 a month or about $636,000 annually.

**Type 2-3: Restoration of Overdraft Interest Clearing Accounts**

**Settlement 2-3:** S42.2 million, more or less.

Specific Settlement to restore $42.2 million in unidentified Overdraft Interest Clearing Accounts to the IIM Pool. Amount is equivalent to non-earning assets which deprive current IIM account holders of over $2 million in annual income.

**Type 2-4: Settlement of Miscellaneous Losses at Office of Trust Funds Management**

**Settlement 2-4:** S 28.3 million:

| | |
|---|---|
| Losses and associated interest | $10.0 |
| To bring subsidiary (IRMS) and Control Acct (Omni) into balance | 10.8 |
| Budget Suspense Accts | 1.0 |
| To clean-up all remaining General Ledger Accts | 6.5 |
| **Approximate Total** | **$28.3** |

$28.3 million will clear known losses, aged suspense accounts, unreconciled general ledger entries and other accounting errors of the past which cannot be recovered.

The "Approximate Total" of $28.3 million is the best estimate of the funds that would be required to wipe the slate clean as of 8/29/96. This liability has accrued over numerous years and various accounting systems and conversions (from manual systems to automated systems). Just to reiterate this is the best estimate of the potential liability that continues to grow, and was derived

from numerous accounting systems that at best are very suspect as to their accuracy.

## Type 2-5 IIM and Tribal Account Holders Joint Settlement on Systems Improvements Implementation of the Special Trustee's Strategic Plan

**Settlement 2-5: $147 million.**

IIM account beneficiaries would share with tribal beneficiaries in the $147 million proposed by the Special Trustee to bring trust management policies, procedures, practices and systems up to a commercial standard within three years.

Rationale:

As noted, in February 1996 the OST produced a conceptual Strategic Plan to acquire and institutionalize specified systems. Implementation of this plan will ensure that the U. S. Government establishes appropriate policies and procedures, develops necessary systems and takes the affirmative actions necessary to provide an accurate and timely accounting to American Indian trust beneficiaries in the future. In this manner the proper discharge of the Secretary of the Interior's trust responsibilities finally can be accomplished. The Strategic Plan (attached) reads in part:

Phase I of the Strategic Plan is designed to bring the trust accounting and management systems up to commercial standards within three years. This, at a minimum, will involve acquiring, automating, updating, integrating, coordinating and consolidating to produce:

1. A trust resource/asset management delivery system.

2. An accounts receivable data and billing system that uses lease-contract and land and ownership information.

3. A trust, depository, payments and delivery system for Individual Indian Money (IIM) accounts.

4. A land records and title recordation and certification system.

5. A general ledger and general ledger accounting system.

6. A technology services center dedicated to trust resource and funds management.

7. A national archives and records center.

8. A risk management and control system.

9. An independent institutional structure.

This will involve consolidating trust resources, trust funds and land ownership and records management processes into a single, independent institutional unit with its own management

Attachment C Part 3 to Boswell Declaration

0606

structure to accommodate the restructuring and reorganization contemplated by Phase I of the Strategic Plan. The unit should be organized by function and dedicated exclusively to trust management. The unit should have agency or bureau status within the Department of the Interior or elsewhere.

The details are contained in the attached Special Trustee's Strategic Plan.

The details of the costs to implement the Strategic Plan are also in the attachment. The summary costs are as follows:

22

Cost of Special Trustee's Strategic Plan Phase I
( $ in thousands)

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | Total |
|------|------|------|------|------|------|-------|
| 3,000 | 49,682 | 32,706 | 20,389 | 20,586 | 20,585 | 146,948 |

The implementation of the OST Strategic Plan will provide with reasonable assurance an accurate and timely accounting of the IIM and tribal trust account balances, collections, deposits, disbursements, investments and return on investments. For this reason, the OST Strategic Plan implementation and costs are an integral part of both the IIM settlement proposals and the tribal settlement proposals.

## 2-6: Settlement for Reconciliation Project Unreconciled Transactions

**Settlement 2-6A:**        **$300 million**

This is a general settlement of potential damages for all unreconciled transactions arising from the Reconciliation Project. Proceeds of this general settlement will be used to partially capitalize the Development Bank contemplated by Settlement 2-7.

**Settlement 2-6B:**        **$300 million**

This is a specific settlement for the following 32,901 transactions for which supporting documentation could not be located during the Reconciliation Project ($ millions, absolute value):

| | |
|---|---|
| Receipts: | 1,123.3 |
| Transfers: | 479.6 |
| Disbursements | 808.6 |
| Total | 2,411.5 |

Actual Disbursement Exposure can be computed as:

| | |
|---|---|
| Unreconciled ($ million, absolute value) | 808.6 |
| Less: Positive Disbursements | (73.6) |
| Attorney and Expert Witness Fees | (40.5) |
| Alaska Regional Corporations | 119.5 |
| Principal Disbursement Exposure | 575.1 |
| Interest on Principal | 1,361.8 |
| Total Disbursement Exposure | 1,936.9 |

$300 million will be disbursed to individual tribes with known unreconciled disbursements. The settlement for each tribe would equal the product of the percentage of each tribe's unreconciled disbursements plus interest (date of inception through 12/31/95) to total unreconciled disbursements

23

plus interest on the total times the settlement amount of $300 million. The excess principal and interest potential liability to the tribes will be considered satisfied by the 2-6A general settlement and by the 2-7 general settlement.

Rationale:

These aggregate settlements are to be awarded to tribal trust account beneficiaries based generally on the $2.2 billion of unreconciled non-investment transactions (excluding positive transactions and payment of attorney's and expert witness fees and expenses and certain other exclusions for which reasonable proof of payment exists) identified by the Reconciliation Project.

The disbursement errors and exceptions are of particular importance and concern since they represent known amounts which were charged against known tribal accounts, but for which the payee could not be determined during the Reconciliation Project. Therefore, proof of who benefitted from these disbursements cannot be established by the federal government. The unreconciled disbursements expose the government to the greatest potential liability and are treated accordingly in the allocation of the settlement amounts, both specifically to tribes and in the general settlement as well.

$575.1 million is a net amount representing unreconciled disbursements as defined above. Compounded interest from the date of the errors through December 31, 1995 is $1,361.8 million.

Distribution is based on the reasons stated below.

**Settlement 2-6A: $300 million**

It is proposed that this amount be distributed to all tribes with trust accounts in a general way. The proceeds will be used to provide part of the initial capital for the Development Bank described in Type 2-7.

The rationale for Settlement 2-6A is as follows. Had a full accounting been possible for the $575.1 million in unreconciled disbursements or had the Reconciliation Project covered previous or different reconciliation periods, different results might have occurred and tribes other than those covered in Settlement 2-6B might have suffered harm, damage or loss. Also, those tribes covered in Settlement 2-6B might have had different levels of harm, damage or loss as well. The general settlement is intended to cover any damages which may have occurred as a result.

In addition, it appears that the condition of the records and the quality of the trust management systems were much worse for periods prior to 1972. Therefore, it is reasonable to assume that substantially more unreconciled receipts, transfers and disbursements would have been exposed had the Reconciliation Project covered periods prior to 1972. Any harm or damage resulting is intended to be covered by the 2-6A general settlement of $300 million and general settlement 2-7.

The general settlements also compensate trust beneficiaries that may have been harmed as a

24

result of mis-posted receipts and transfers which may have occurred in the universe of unreconciled receipts and disbursements. Receipts are mostly deposits. The government can demonstrate that the unreconciled receipts were posted to the general ledger accounts of particular tribes, so those tribes benefitted by the transactions and are unlikely to bring a claim as a result. The same is true, generally, for unreconciled transfers between accounts of the same tribe. There is no evidence of damage to these tribes, but if transfers were mis-posted and should have been posted to the account of a different tribe, damage to the other tribe may have resulted. There is simply no way to determine whether damage occurred to particular beneficiaries as a result of the unreconciled receipts or transfers, nor who these harmed beneficiaries were. The general settlements, however, are intended to cover any such unidentified harm or damage.

To partially compensate all eligible tribal trust account holders for the harm and damage which might have occurred as a result of the unreconciled transactions, $300 million will be awarded. The proceeds will be used to capitalize in part the Development Bank which will benefit all tribes.

**Settlement 2-6B: $300 million.** It is proposed that this amount be distributed to individual tribes with known unreconciled disbursements since these items represent the highest potential for actual harm and damage having occurred for Tribal trust beneficiaries.

The settlement for each tribe would be equal to the product of the percentage of each tribe's unreconciled disbursements plus interest (calculated from date of the transaction through December 31, 1995) to total unreconciled disbursements plus interest on the total unreconciled disbursements times the settlement amount of $300 million. While this may not cover all the potential damage which may have resulted from these unreconciled disbursements, the total award to the tribes covers 52% of total unreconciled disbursement exposure and 15.5% of total unreconciled disbursement exposure plus interest on those transactions from inception. Excess damage, if any, is intended to be covered by settlement 2-6A and by the general settlement 2-7.

**Type 2-7:    General Settlement for IIM and Tribal Account Holders
        Establishment of a Development Bank for American Indians**

**Settlement 2-7:    Establishment of a Development Bank for American Indians
        with the following capital and guarantees to be provided by the
        U. S. Government:**

| | |
|---|---|
| **2-7A. Equity Capital** | **$500 million** |
| **2-7B. Borrowing Capacity** | **10 x Equity Capital** |
| **2-7C. Initial Borrowing from U. S.** | **$3 billion for 30 yrs at 30 year T Rate** |

Settlement 2-7 is intended to settle all other potential claims arising out of the reconciliation project not covered by Type 1 claims and other Type 2 claims and past potential liability for trust mismanagement practices in general. A full explanation of the rationale on this settlement and

25

details on the Development Bank can be found in Appendix 1.

General Settlement 2-7 involves the creation of a federal Development Bank for American Indians (D-Bank) which will be formed and capitalized by the federal government and will be a nationwide financial institution providing a dependable source of lending to American Indians and American Indian Tribes and their communities and a dependable source of investing in American Indian Enterprises.

D-Bank will provide access to long-term loans and investments for economic development, consistent with principles of self-determination, self-governance and self-sufficiency and will provide access to low interest rates on loans, made possible by D-Bank's tax free status and its access to funding in the nation's capital markets at rates commensurate with those paid by the U.S. Government and Agencies of the U.S. Government.

D-Bank will also be allowed to invest up to $300 million in the purchase, holding, financing and sale of fractionated realty interests in Indian allotment lands. Such purchases and financings will be made on prudential terms to eligible individuals and tribes. Such activities will be regulated by rules set forth in legislation to resolve the fractionated heirship issues and will be administered to achieve the consolidation of existing fractional interests and the prevention or substantial reduction of further fractionation.

D-Bank will be a for-profit financial institution and will not receive appropriated funds for operating expenses. It will receive appropriated funds for lifeline financial services and other specified programs as approved by Congress.

D-Bank will be authorized to invest up to 25% (initially $125 million) of its permanent capital in eligible individual Indian and Indian Tribe businesses and projects which will aid economic development of the American Indian communities. These investments include common and preferred stock and long-term subordinated draft investments in:

A.    Infrastructure Acquisition and Development Activities
B.    Project Financing
C.    Venture Capital Businesses
D.    Established Business

Attachment C Part 3 to Boswell Declaration                    0611

D-Bank's capital and funding will be provided by the federal government in the following amounts:

2-7A.  Equity Capital:                                                          500

Initial Equity Capital of $500 million will be provided by the federal government as part of Settlement 1-6A ($200 Million) and 2-6A ($300 million).  Shares will be distributed to all federally recognized tribes on some equitable basis set forth in legislation.

2-7B.  Loans from U. S. Government:                                   3,000

$3 billion in direct long-term loans will be provided to D-Bank for thirty years at the U. S. Treasury rate for 30 year obligations.

2-7C.  U. S. Government Guaranteed Obligations              5,000

Future funding of up to 10 times equity capital from the sale of bonds and notes in the nation's capital markets by D-Bank will be guaranteed by the full faith and credit of the United States.  Loans from the United States Government of $3 billion are included in this amount.

27